IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

HEATHER N. THOM,

    Plaintiff,

    v.

NANCY A. BERRYHILL,
Acting Commissioner of Social Security,

    Defendant.

Case No. 6:16-cv-01840-SB

**FINDINGS AND
RECOMMENDATION**

_____

**BECKERMAN, Magistrate Judge.**

    Heather Thom ("Thom") brings this appeal challenging the Commissioner of Social Security's ("Commissioner") denial of her applications for Disability Insurance Benefits and Supplemental Security Income under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-34, 1381-83f. The Court has jurisdiction to hear this appeal pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). For the reasons that follow, the Court recommends that the district judge reverse the Commissioner's decision because it is based on legal error and not supported by substantial evidence.

**BACKGROUND**

Thom was born in April 1985, making her twenty-seven years old on July 16, 2012, the alleged disability onset date. She has a General Equivalency Diploma and past relevant work experience as a housekeeper and companion, and she is currently an unemployed single mother of a nine-year-old child. In her applications for benefits, Thom alleges disability due to bipolar disorder, posttraumatic stress disorder, major depressive disorder, and anxiety disorder. (Tr. 64, 75, 169.)

On September 12, 2012, Thom underwent a nerve conduction study of her bilateral upper extremities, which revealed that she suffers mild left and moderate right carpal tunnel syndrome in her wrists and mild right cubital tunnel syndrome in her elbow. (Tr. 425, 432.) Thom's neurologist, Dr. Benton Davidson ("Dr. Davidson"), noted that Thom could treat (1) her carpal tunnel syndrome by wearing a brace at night, using "[i]ce or cool compresses" on the "tendons for an hour once or twice a day for several days after the wrist feels fine," and "avoiding trauma to the proximal palm," which "is essential to recovery," and (2) her cubital tunnel syndrome by using "a towel wrapped a few nights to train to keep the [right] elbow straighter than [ninety] degrees" and "avoiding trauma and repetitive hyperflexion to the elbow during the day." (Tr. 432.)

On December 12, 2012, Thom appeared for an assessment with Jennifer Carley ("Carley"), a psychiatric mental health nurse practitioner. Thom complained of depression that impacted her motivation to "even want to take a shower," and reported that she gained weight due to binge eating, experiences panic attacks "about once every two weeks" that last "about an hour," has "a bad problem with consistency in [her] moods," and has "difficulty living" due to memories of childhood sexual abuse. (Tr. 292.) Carley's diagnoses were posttraumatic stress

disorder and bipolar disorder, and she assigned a Global Assessment of Functioning ("GAF") score of fifty-eight.[1] (Tr. 298.)

On February 11, 2013, Thom underwent a "right revision tympanomastoidectomy and ossicular reconstruction" procedure in an attempt to resolve issues related to ear infections and pain. (Tr. 539-40.)

On March 12, 2013, Thom visited her primary care physician, Dr. Brett Robinson ("Dr. Robinson"), and reported "doing fairly but feel[ing] discouraged" about recurring ear infections. (Tr. 419.) Dr. Robinson noted that Thom was using lithium and lamotrigine to treat bipolar disorder, and recommended that Thom engage in "daily walking for exercise/mental health." (Tr. 419.)

On March 13, 2013, Dr. Irmgard Friedburg ("Dr. Friedburg"), a non-examining state agency psychologist, completed a psychiatric review technique assessment. (Tr. 67-68.) Based on her review of the record, Dr. Friedburg concluded that the limitations imposed by Thom's mental impairments failed to satisfy listings 12.04 (affective disorders) and 12.06 (anxiety-related disorders).

Also on March 13, 2013, Dr. Friedburg completed a mental residual functional capacity assessment form, in which Dr. Friedburg rated Thom's limitations in each of twenty categories of mental ability. (Tr. 69-71.) Dr. Friedburg rated Thom to be "not significantly limited" in thirteen categories and "moderately limited" in seven categories. (Tr. 69-71.) Dr. Friedburg also concluded that Thom (1) is "capable of understanding and remembering simple routine tasks but

---

[1] "GAF rates overall psychological functioning on a scale of 0–100 that takes into account psychological, social, and occupational functioning." *Zabala v. Astrue*, 595 F.3d 402, 405 n.1 (2d Cir. 2010). A GAF score of fifty-eight "suggests moderate difficulties in occupational functioning." *Goble v. Astrue*, 385 F. App'x 588, 594 (7th Cir. 2010) (citation omitted).

is incapable of more complex tasks," (2) "would be able to follow simple instructions but would occasionally struggle with more complex instructions," (3) "is capable of appropriate supervisor interactions," but should be "limited to occasional public and co-worker contact," and (4) "would benefit from a consistent work environment [that is] free from frequent job duty changes." (Tr. 69-71.)

On May 7, 2013, Thom established care with Amber Eriksson ("Eriksson"), a psychiatric mental health nurse practitioner. During the visit, Thom reported that she was "very depressed," stayed "in bed most of the day," overate frequently, did "not usually go outside" because her anxiety "escalates when she leaves the house," had "a history of panic attacks but has not had them in a while," and was prescribed Xanax to treat anxiety and felt that "it was helpful." (Tr. 433.) Eriksson noted that Thom's primary diagnoses were bipolar disorder and posttraumatic stress disorder, assigned a GAF of forty-five,[2] and stated that Thom's status was "[w]orsening." (Tr. 437.)

On June 10, 2013, Thom visited Eriksson and reported that an initial "improvement in her mood and energy levels on Wellbutrin" had "worn off," and that she continued to "feel tired during the day" and experience difficulties with everyday tasks, such as keeping track of bills and medical appointments for her and her son and completing housework and chores. (Tr. 439.) Thom also reported that she "was a bridesmaid in her friend's wedding over the weekend" and she found "it very hard to be around so many people, but she did it." (Tr. 439.) Eriksson noted that Thom's status was "[i]mproving" because she did not report "the same level of depression" and "frequency of crying episodes," and that Thom endorsed symptoms of attention deficit

---

[2] A GAF of forty-one to fifty indicates "serious symptoms or [a] serious impairment." *Bland v. Astrue*, 432 F. App'x 719, 721 n.1 (10th Cir. 2011) (citation, quotation marks, and brackets omitted).

disorder ("ADD"). (Tr. 443.) Eriksson prescribed methylphenidate to treat Thom's ADD symptoms.

On July 5, 2013, Dr. Bill Hennings ("Dr. Hennings"), a non-examining state agency psychologist, completed a psychiatric review technique assessment, adopting Dr. Friedburg's initial conclusion that Thom's mental impairments failed to satisfy listings 12.04 and 12.06. (Tr. 81.)

Also on July 5, 2013, Dr. Hennings completed a mental residual functional capacity assessment form, adopting Dr. Friedburg's initial findings in all relevant respects. (*See* Tr. 83-84.)

On July 10, 2013, Thom informed Eriksson that she "struggled with taking the methylphenidate" and "found it very difficult to stay consistent with her doses," that her "anxiety has been elevated, as she has not wanted to go out of her house" and she "avoids social situations" because she "has a fear of going places where she will have to talk to others," and that her depression "has been more significant lately." (Tr. 445.) Thom also reported that she "has a lot of guilt for not getting up, getting dressed, and hanging out with her son," that she will take her son to "the movies and places where she will not have to talk to others," and that she "is very tired and feeling hopeless she will ever feel better." (Tr. 445.) Eriksson noted that Thom's status was "[w]orsening," that Thom "had some positive benefits from [her ADD medication] including increased focus, motivation, and energy," but as the medication "was wearing out of her system, she experienced increased anxiety which became intolerable for her," and that Thom's depression symptoms are "significant and interfering with her daily functioning." (Tr. 449.)

On July 31, 2013, Thom visited Eriksson and reported that her mood and anxiety had "improved," but Eriksson still observed that Thom's response to treatment was "[p]oor." (Tr. 451, 458.)

In a letter dated February 17, 2014, Eriksson responded to certain questions posed by Thom's attorney. Eriksson stated that Thom's bipolar disorder, posttraumatic stress disorder, and ADD "greatly impact" her "ability to attend and function at work on a regular and consistent basis," symptoms associated with Thom's "diagnoses often come and go and get better and worse," Thom "may be able to function well for a couple of days, followed by several days of inability to even get out of bed," medications are "instrumental" to Thom's treatment, but they have "side effects and need to be monitored on a regular basis," and Eriksson is "unsure which medications" Thom "is currently taking" because she has "not seen [Thom] in quite some time." (Tr. 512.)

Also on February 17, 2014, Eriksson completed a mental residual functional capacity assessment form, in which Eriksson rated Thom's limitations in each of twenty categories of mental ability. Eriksson opined that Thom suffers from "[m]oderately [s]evere" limitations (e.g., she "has or will have noticeable difficulty" performing the designated task or function "more than [twenty] percent of the workday") in her ability to: (1) perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerance, (2) work in coordination with or proximity to others without being distracted by them, (3) complete a normal work day without interruptions from psychologically based symptoms, (4) interact appropriately with the general public, (5) ask simple questions or request assistance, (6) accept instructions and respond appropriately to criticism from supervisors, and (7) travel in unfamiliar places or use public transportation. (Tr. 513-14.) Eriksson also opined that Thom suffers from "[m]oderate"

limitations (e.g., she "has or will have difficulty performing" the designated task or function between eleven and twenty "percent of the workday") in her ability to: (1) understand and remember detailed instructions, (2) carry out detailed instructions, (3) maintain attention and concentration for extended periods, (4) sustain an ordinary routine without special supervision, (5) make simple work-related decisions, (6) complete a normal workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods, (7) get along with co-workers or peers without distracting them or exhibiting behavioral extremes, and (8) set realistic goals or make plans independent of others. (Tr. 513-14.)

In her concluding remarks, Eriksson noted that the symptoms associated with Thom's bipolar disorder, posttraumatic stress disorder, and ADD "make regular, consistent work very difficult," that Thom's "symptoms wax and wane creating significant disruption in her life," and that Eriksson's ratings were based on "clinical signs and symptoms" of poor focus, poor short-term memory, lack of motivation, disorganization, mood swings, and difficulty with social interactions. (Tr. 514.)

On March 18, 2014, Thom informed Dr. Robinson that she "feels depressed all the time," "avoids talking to people" due to anxiety, recently "joined [P]lanet [F]itness," and experiences numbness in her toes when she engages in "exercises like bik[ing] or walking." (Tr. 606.) Dr. Robinson noted that Thom had "been trying to get into mental health" treatment and was "not on mental health med[ications]," and advised Thom to connect with a mental health provider. (Tr. 606.)

On April 2, 2014, Thom underwent a nerve conduction study that revealed moderate bilateral carpal tunnel syndrome, and an electromyography that "did not reveal denervation [or]

myopathy." (Tr. 522.) Dr. Davidson noted that carpal tunnel release surgery often will relieve pain that does not respond to conservative treatment and Thom "would wait" until an infection resolved. (Tr. 522.)

On April 14, 2014, Thom underwent a "right revision tympanomastoidectomy." (Tr. 544.) Thom's treatment records revealed "a postoperative diagnosis [from an otolaryngologist] of [c]hronic mastoid disease and recurrent cholesteatoma and conducti[ve] hearing loss." (Tr. 556.)

On May 7, 2014, Thom appeared for a mental health assessment with Martha Witt ("Witt"), a qualified mental health practitioner at Polk County Health Services. Witt noted that Thom reported "having difficulty managing [her] symptoms," which are "impeding" Thom's ability to attend to her activities of daily living, stated that Thom's prognosis was "deemed fair" and that her "primary" diagnosis was major depressive disorder, ruled out a diagnosis of bipolar disorder, observed that Thom's reported symptoms did not meet the "full criteria" for posttraumatic stress disorder or generalized anxiety, and assigned a GAF score of forty.[3] (Tr. 649-50.)

On June 9, 2014, Thom appeared for a comprehensive audiological evaluation with Dr. Anh Nguyen-Huynh ("Dr. Nguyen-Huynh"), an otolaryngologist at Oregon Health and Sciences University. Dr. Nguyen-Huynh noted that Thom suffers from "right ear pain and drainage from Eustachian tube dysfunction, mucoid otitis media and mastoiditis, which have not responded to canal-wall-up tympanomastoidectomy, T-tube placement and topical ofloxacin." (Tr. 587.) Based on his evaluation and review of Thom's records, Dr. Nguyen-Huynh "suspect[ed]" that

---

[3] "A GAF of forty indicates some impairment in reality testing or communication, or major impairment in several areas such as work or school, family relations, judgment, thinking, or mood." *Bayliss v. Barnhart*, 427 F.3d 1211, 1217 n.3 (9th Cir. 2005) (citation omitted).

Thom's "right ear symptoms are due more to chronic inflammation than acute infection," and he therefore recommended that Thom treat her condition with a nonsteroidal anti-inflammatory drug and prednisone. (Tr. 587.) Dr. Nguyen-Huynh also "reassure[d]" Thom "that as the inflammation in the ear settles down she will not have much need for oxycodone," and observed that further surgical intervention "might be" necessary if Thom failed "medical management." (Tr. 587.)

In a treatment note dated October 7, 2014, Josh Sizemore ("Sizemore"), a treating psychiatric mental health nurse practitioner at Polk County Health Services, noted that Thom was "not taking medications as prescribed" and "made no effort" to follow Sizemore's recommendation to "change [her] sleep pattern" by not "[s]taying up all night and sleeping during the day." (Tr. 707.) Sizemore also noted that he continued to feel that Thom's use of "pain medications [is] contributing to her mood instability and sleep disruption," even though Thom was "not open to accept" such a conclusion and argued with Sizemore over the matter. (Tr. 708.)

On November 12, 2014, Thom reported that she recently underwent carpal tunnel release surgery on her right wrist, which was "more flexible than when [the left wrist] was done and not so painful." (Tr. 695.)

On January 14, 2015, Thom appeared for a psychiatric evaluation with Dr. Alfredo Soto ("Dr. Soto") at Polk County Health Services. On mental status examination, Thom's attention and concentration were "intact," her cognitive and memory skills appeared "grossly average," and her thought process was "goal oriented and logical, with no evidence of delusional thinking or response to internal stimuli." (Tr. 761.) Dr. Soto assigned a GAF score of forty, stated that Thom's "primary diagnosis seems more consistent" with posttraumatic stress disorder, and

observed that Thom showed signs of ADD, such as "disorganized thought and inattention." (Tr. 762-63.)

On February 24, 2015, Thom appeared and testified at a hearing before an Administrative Law Judge ("ALJ"). (Tr. 39-62.) Thom testified that she alleged the onset of disability in July 2012, because she "was really depressed at that time and [she] was having surgeries starting on [her ears], and [she] was in counseling, and [she] just couldn't get off the couch kind of." (Tr. 46.) Thom added that she has lost jobs due to depression-related absences, she experiences daily migraines and pain due to chronic mastoiditis and a recurring skin growth in her right ear, she has "lost all hearing" in her right ear, her mother comes over once a month to "whip" Thom's apartment "into shape," her son "kind of does everything on his own," but Thom makes sure he has clothes to wear and "nothing happens" to him, the carpal tunnel release surgery on her right wrist is "not quite right" after "it got infected with staph" (i.e., she "can't hold things for long periods with [her] right hand"), she takes her medications as prescribed, she has not had any issues with drugs or alcohol since she was a teenager, and she sleeps "a lot during the daytime." (Tr. 47-53.)

The ALJ posed a series of hypothetical questions to a Vocational Expert ("VE") who testified at Thom's hearing. First, the ALJ asked the VE to assume that a hypothetical worker of Thom's age, education, and work experience could perform light work that involved lifting no more than twenty pounds; frequently lifting or carrying ten pounds; standing, sitting, or walking for up to six hours in an eight-hour workday; pushing and pulling in accordance with the lifting restrictions, but no more than frequent pushing or pulling with the right upper extremity; never climbing ladders, ropes, or scaffolds; occasionally climbing ramps or stairs, balancing, stooping, crouching, kneeling, and crawling; frequent handling, gross manipulation, grasping, pulling,

fingering, picking, fine manipulation, and turning of objects with the dominant right hand; avoiding concentrated exposure to hazards, such as moving machinery and unprotected heights; understanding and remembering simple job instructions; performing simple, routine, and repetitive tasks; no more than occasional changes in the work setting; maintaining attention and concentration for two-hour intervals with "the normally expected brief interruption" (i.e., being off task less than ten percent of the time); engaging in occasional and "superficial interaction" with the public and co-workers; and engaging in superficial interaction with supervisors. (Tr. 58-59.) The VE testified that the hypothetical worker could not perform Thom's past relevant work, but she could be employed as a small products assembler II, electronics worker, and garment sorter.

Responding to the ALJ's second question, the VE confirmed that the hypothetical worker could not perform the above positions if she was limited to occasional handling and fingering with the dominant right hand. Responding to the ALJ's remaining questions, the VE confirmed that the worker could not sustain full-time employment if she was off task more than ten percent of the workday or incurred "two or more absences . . . on a monthly or near monthly basis." (Tr. 60.)

In a written decision issued on March 26, 2015, the ALJ applied the five-step evaluation process set forth in 20 C.F.R. §§ 404.1520(a)(4) and 416.920(a)(4), and determined that Thom was not disabled. *See infra*. The Social Security Administration Appeals Council denied Thom's petition for review, making the ALJ's decision the Commissioner's final decision. Thom timely appealed.

///

///

# THE FIVE-STEP SEQUENTIAL ANALYSIS

## I.    LEGAL STANDARD

A claimant is considered disabled if he or she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A). "Social Security Regulations set out a five-step sequential process for determining whether an applicant is disabled within the meaning of the Social Security Act." *Keyser v. Comm'r Soc. Sec. Admin.*, 648 F.3d 721, 724 (9th Cir. 2011). Those five steps are: (1) whether the clamant is presently engaged in any substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the impairment meets or equals a listed impairment; (4) whether the claimant can return to any past relevant work; and (5) whether the claimant is capable of performing other work that exists in significant numbers in the national economy. *Id.* at 724-25. The claimant bears the burden of proof for the first four steps. *Bustamante v. Massanari*, 262 F.3d 949, 953-54 (9th Cir. 2001). If the claimant fails to meet the burden at any of those steps, the claimant is not disabled. *Id.*; *Bowen v. Yuckert*, 482 U.S. 137, 140-41 (1987).

The Commissioner bears the burden of proof at step five of the process, where the Commissioner must show the claimant can perform other work that exists in significant numbers in the national economy, "taking into consideration the claimant's residual functional capacity, age, education, and work experience." *Tackett v. Apfel*, 180 F.3d 1094, 1100 (9th Cir. 1999). If the Commissioner fails to meet this burden, the claimant is disabled. *Bustamante*, 262 F.3d at 954 (citations omitted).

///

///

## II.    THE ALJ'S DECISION

The ALJ applied the five-step sequential evaluation process to determine if Thom is disabled. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). (Tr. 17-30.) At step one, the ALJ determined that Thom had not engaged in substantial gainful activity since July 16, 2012, the alleged onset date. At step two, the ALJ determined that Thom had the following severe impairments: "carpal tunnel syndrome, moderate on the right, mild on the left; right cubital tunnel syndrome; chronic right mastoiditis; headaches; major depressive disorder; [and] anxiety disorder." (Tr. 19.) At step three, the ALJ concluded that Thom did not have an impairment that meets or equals a listed impairment. The ALJ then concluded that Thom had the residual functional capacity ("RFC") to perform light work, subject to the following restrictions: (1) the work can involve no more than frequent pushing and pulling with the right upper extremity, frequent "handling, gross manipulation, grasping, holding, and turning objects with the right, dominant hand," and frequent "fine manipulation, fingering, picking, and pinching with fingers of the right, dominant hand," (2) the work can involve no more than occasional balancing, stooping, crouching, kneeling, crawling, and climbing of ramps and stairs, occasional changes in the work setting, and occasional and "superficial" interaction with the public and co-workers, (3) the work cannot involve climbing ladders, ropes, or scaffolds, or concentrated exposure to hazards, such as moving machinery and unprotected heights, (4) the work should involve only "superficial interaction with supervisors," and (5) the work must be consistent with an ability to "understand and remember simple job instructions and perform simple, routine, and repetitive tasks," and the ability "to maintain attention and concentration for two hour intervals to complete those tasks without more than the normally expected brief interruptions" (i.e., "off-task less than [ten] percent of the time"). (Tr. 22.) At step four, the ALJ concluded that Thom could not perform her past relevant work. At step five, the ALJ concluded that Thom can perform other

jobs that exist in significant numbers in the national economy, including work as a small products assembler, electronics worker, and garment sorter. Accordingly, the ALJ determined that Thom was not disabled.

## STANDARD OF REVIEW

The district court may set aside a denial of benefits only if the Commissioner's findings are "'not supported by substantial evidence or based on legal error.'" *Bray v. Comm'r Soc. Sec. Admin.*, 554 F.3d 1219, 1222 (9th Cir. 2009) (quoting *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 882 (9th Cir. 2006)). Substantial evidence is defined as "'more than a mere scintilla [of evidence] but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* (quoting *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995)).

The district court "cannot affirm the Commissioner's decision 'simply by isolating a specific quantum of supporting evidence.'" *Holohan v. Massanari*, 246 F.3d 1195, 1201 (9th Cir. 2001) (quoting *Tackett*, 180 F.3d at 1097). Instead, the district court must consider the entire record, weighing the evidence that both supports and detracts from the Commissioner's conclusions. *Id.* If the evidence as a whole can support more than one rational interpretation, the ALJ's decision must be upheld; the district court may not substitute its judgment for the judgment of the ALJ. *Bray*, 554 F.3d at 1222 (citing *Massachi v. Astrue*, 486 F.3d 1149, 1152 (9th Cir. 2007)).

## DISCUSSION

In this appeal, Thom argues that the ALJ erred by failing to: (1) provide germane reasons for discounting the opinion of Thom's treating psychiatric mental health nurse practitioner, Eriksson; (2) provide specific, clear, and convincing reasons for discounting Thom's symptom testimony; (3) provide germane reasons for discounting the lay witness testimony provided by

Thom's mother, Cheyanne Lefore ("Lefore"); and (4) resolve an apparent conflict between the VE's testimony and the Dictionary of Occupational Titles ("DOT"). As explained below, the Court finds that Commissioner's decision is based on legal error and not supported by substantial evidence. Accordingly, the Court recommends that the district judge reverse the Commissioner's decision.

## I.    ERIKSSON'S OPINION

### A.    Applicable Law

In Social Security cases, "a nurse practitioner is not an acceptable medical source. Rather, nurse practitioners are defined as 'other sources,' the testimony of whom the administrative law judge may discount if he 'gives reasons germane to each witness for doing so.'" *Britton v. Colvin*, 787 F.3d 1011, 1013 (9th Cir. 2015) (quoting *Molina v. Astrue*, 674 F.3d 1104, 1111 (9th Cir. 2012)). Germane reasons for discounting opinion evidence from an "other source" include: (1) the fact that the other source relied to a large extent on a claimant's properly discounted self-reports, *Lombard v. Colvin*, No. 13-cv-1530–MC, 2015 WL 1477993, at *3 (D. Or. Mar. 31, 2015); (2) the fact that the evidence from the other source is inconsistent with "objective evidence," *Ramirez v. Berryhill*, No. 15-cv-02988, 2017 WL 1196728, at *15 (N.D. Cal. Mar. 31, 2017); and (3) the fact that the other source's opinion is "inconsistent with the claimant's activities," *Vallandingham v. Colvin*, No. 14-cv-04847, 2015 WL 1467189, at *2 (C.D. Cal. Mar. 26, 2015).

### B.    Application of Law to Fact

The ALJ gave "little weight" to Eriksson's opinion that Thom's "impairments make regular, consistent work very difficult," because it is inconsistent with Thom's "residual functional capacity or with the available evidence, including evidence that [Thom] was able to work almost continuously from July 2009 through June 2012," and because Eriksson "advised"

that she had not seen Thom in "'quite some time' and [thus] was unsure as to what medications [Thom] was [currently] taking." (Tr. 26.) The ALJ also gave "some weight" to Eriksson's opinions regarding Thom's ability to "interact with the general public and to carry out detailed instructions," because they "are mostly consistent with the [ALJ's] residual functional capacity" assessment. (Tr. 26.)

As an initial matter, Thom argues that the ALJ erred by discounting Eriksson's opinion to the extent it is inconsistent with the ALJ's RFC assessment. (Pl's Opening Br. at 13-14.) The Commissioner responds by arguing that "[t]he ALJ's decision is entitled to a common sense reading," and that "[a] common sense reading supports that the ALJ found that the medical opinion evidence was more supportive of the RFC assessment than" Eriksson's opinion. (Def.'s Br. at 14.)

In *Laborin v. Berryhill*, 867 F.3d 1151 (9th Cir. 2017), the Ninth Circuit addressed a situation similar to the one presented here. In that case, the ALJ discounted the claimant's testimony to the extent it was inconsistent with the RFC assessment. *Id.* at 1152. The Ninth Circuit observed that an ALJ assesses a claimant's RFC "based on all the relevant evidence in the case record," including the "medical evidence," the claimant's testimony, and descriptions and observations provided by "family, friends, and other people." *Id.* at 1153 (citation, quotation marks, and brackets omitted). The Ninth Circuit thus held that the ALJ erred by discounting the claimant's testimony to the extent it was inconsistent with the RFC assessment, because such a finding "'inverts the responsibility of an ALJ, which is first to determine the medical impairments of a claimant based on the [relevant evidence in the case] record . . . and only *then* to determine the claimant's RFC.'" *Id.* at 1154 (quoting *Trevizo v. Berryhill*, 862 F.3d 987, 1000 n.6 (9th Cir. 2017)). The Ninth Circuit also held that the error was not harmless because the ALJ

failed to provide other legally sufficient reasons for discounting the claimant's testimony. *Id.* at 1155-56.

As in *Laborin*, the ALJ in this case erred by discounting Eriksson's opinion to the extent it was inconsistent with the ALJ's RFC assessment. *See Rigole v. Berryhill*, No. 15-2072-JE, 2017 WL 4839075, at *6 (D. Or. Oct. 26, 2017) (citing *Laborin* for its rule that "credible evidence must be taken into account when assessing a claimant's RFC and cannot be discredited because it is inconsistent with that RFC," and thus holding that the "ALJ erred by discrediting the VA's [disability] determination on the grounds that it was inconsistent with the ALJ's RFC determination"); *see also Laborin*, 867 F.3d at 1154 (noting that an RFC "must be based on the evidence, . . . rather than forcing the [relevant evidence] into a foregone [RFC] conclusion") (citation omitted). The remaining question, then, is whether the ALJ provided other germane reasons for discounting Eriksson's opinion, because if he did, the above error is harmless. *See id.* (explaining that rejecting evidence on the ground that it is inconsistent with the ALJ's RFC assessment "is not, by itself, reversible error and can be harmless") (citation omitted).

The ALJ also discounted Eriksson's opinion on the ground that it was inconsistent with evidence that Thom "was able to work almost continuously from July 2009 through June 2012." (Tr. 26.) Courts have upheld the rejection of opinion evidence when it is inconsistent with the claimant's work history before the alleged onset of disability. *See Kilbourne v. Berryhill*, No. 3:16-cv-00590-HZ, 2017 WL 1362026, at *5 (D. Or. Apr. 11, 2017) ("Plaintiff does not challenge the ALJ's determination that his PTSD symptoms did not increase after 2004. As a result, the ALJ did not err in concluding that the ability to work in the past despite a severe impairment undermines an opinion that Plaintiff has extreme or marked limitations when the severity of the impairment has not significantly changed."), *appeal docketed*, No. 17-35488 (9th

Cir. Sept. 11, 2017); *Donarski v. Colvin*, No. 14-4419, 2016 WL 6139951, at *9-10 (D. Minn. Feb. 2, 2016) (upholding rejection of doctor's opinion based, in part, on the fact that it was inconsistent with the claimant's "ability to work prior to the onset date while experiencing essentially the same degree of mental impairment"). Courts, however, have also found reliance on the claimant's pre-onset work history misplaced when the claimant's condition has worsened, or when the onset date is based on an accident or injury that rendered the claimant disabled. *See Stoner v. Colvin*, No. 3:16-CV-05373-DWC, 2016 WL 7228784, at *3 (W.D. Wash. Dec. 14, 2016) ("Plaintiff's work history prior to the alleged onset date is of limited probative value. This is particularly true where, as here, Plaintiff was in an accident and suffered a traumatic brain injury on the date of Plaintiff's alleged onset of disability.") (citations omitted); *Mercado v. Colvin*, No. 15-1592, 2016 WL 3640314, at *9 (W.D. Wash. July 8, 2016) (rejecting the assertion that a doctor's opinion was inconsistent with pre-onset work history, and noting that the ALJ found that the claimant's issues had "reportedly worsened [during the period] of her unemployment").

In this case, the Court concludes that the ALJ erred in discounting Eriksson's opinion on the ground that it is inconsistent with Thom's pre-onset work history because the record, including Eriksson's treatment notes, suggests that Thom's condition had worsened. (*See* Tr. 285, observing on September 10, 2012, that Thom reported experiencing certain depression symptoms "frequently for years," but Thom also reported that her "step father repeatedly molested her from age 4 to 11" and she complained of "increased anxiety and nightmares as his release day near[ed]," Tr. 292, observing on December 12, 2012, that Thom reported feeling "worse" and more depressed since August 2012, and she gained twenty to thirty pounds in less than two months due to overeating, Tr. 298, assigning a GAF score of fifty-eight (e.g., moderate

difficulties in occupational functioning) on December 12, 2012, during a biopsychosocial assessment, Tr. 313-14, stating in December 2012 that Thom's depression had "been complicated by learning that [her] closest family member is now on hospice and is requesting no one visit her," and she later "received news . . . that her grandmother died," Tr. 437, establishing care with Eriksson on May 7, 2013, opining that Thom's status was "[w]orsening," and assigning a GAF score of forty-five (e.g., serious symptoms or a serious impairment), Tr. 443, opining on June 10, 2013, that Thom's status was "[i]mproving" because Thom did not report "the same level of depression" and "frequency of crying episodes" as she did during her initial visit with Eriksson, Tr. 449, stating on July 10, 2013, that Eriksson believed that Thom's status was "[w]orsening" and her depression is "significant and interfering with her daily functioning," Tr. 458, indicating on July 31, 2013, that Thom's response to Eriksson's treatment was "[p]oor," Tr. 587, indicating on June 9, 2014, that Thom uses pain medication to treat pain caused by mastoiditis (i.e., an infection that affects the mastoid bone located behind the ear), which had "not responded" to surgical intervention post-onset date, Tr. 740, noting on July 24, 2014, that Thom has a history of "chronic unemployment," and assigning a GAF score of forty (e.g., major impairment), Tr. 708, indicating on October 7, 2014, that Thom's use of pain medications to treat her mastoiditis-related pain is "contributing to her mood instability," and assigning a GAF score of forty-eight (e.g., serious symptoms or a serious impairment), Tr. 762, assigning a GAF score of forty (e.g., major impairment) on January 14, 2015, during a doctor's psychiatric evaluation);[4]

*see also Diedrich v. Berryhill*, ---- F.3d ---- , 2017 WL 4819089, at *6 (9th Cir. Oct. 26, 2017)

---

[4] Although the ALJ assigned "little weight to the GAF scores" (Tr. 27), they provide context for evaluating the Commissioner's claims that "Thom's mental functioning had improved" and that "there is no evidence of a decline in Thom's mental functioning at [or] around the time of the alleged disability onset date" (Def.'s Br. at 12, 15), as well as the ALJ's implicit finding that Thom was able to work while suffering from the same or similar degree of mental impairment.

(explaining that "[c]ycles of improvement and debilitating symptoms are a common occurrence [in cases involving mental health issues], and in such circumstances it is error for an ALJ to pick out a few isolated instances of improvement over a period of months or years and to treat them as a basis for concluding a claimant is capable of working" (quoting *Garrison*, 759 F.3d at 1017-18)).

The ALJ also erred in discounting Eriksson's opinion on the ground that it is inconsistent with Thom's work history, because the ALJ fails to explain how Thom's work history between July 2009 and June 2012 is inconsistent with Eriksson's opinion (*see* Tr. 26, paragraph 3), in particular her opinion that Thom's mental impairments "greatly impact" her "ability to attend and function at work on a regular and consistent basis." (Tr. 512.) That is significant because Thom's work history during this period indicates that she worked for multiple employers for relatively short periods of time and earned well below the monthly average for presumed substantial gainful activity. (*See* Tr. 155, indicating that Thom earned $4,866.00 in 2009 or $405.50 per month, $4,550.45 in 2010 or $379.20 per month, $8,310.15 in 2011 or $692.51 per month, and $5,824.56 in 2012 or $485.38 per month, Tr. 189, reporting that Thom worked for different employers from July 2009 to December 2009, March 2010 to August 2010, and October 2010 to June 2012); *cf. Andry v. Colvin*, No. 12-00746, 2013 WL 5305903, at *3 n.3 (E.D. Cal. Sept. 19, 2013) (noting that work constitutes substantial gainful activity "if the claimant earned on average per month more than . . . $980 in 2009, $1,000 in 2010, $1,000 in 2011, $1,010 in 2012"). Thom's work history appears consistent with Eriksson's opinion that Thom's mental impairments interfere with her ability to engage in substantial gainful activity. Accordingly, the Court concludes that the ALJ erred in discounting Eriksson's opinion on this ground. *See also Boissiere v. Berryhill*, No. 16-2140, 2017 WL 3741261, at *7 (C.D. Cal. Aug.

30, 2017) ("In fact, to the extent plaintiff's work history was 'sporadic,' or reflected a 'fair number' of employers of relatively brief duration, this may actually be consistent with the fact that her physical and/or mental health symptoms were interfering with her ability to maintain full-time employment."); *Walberg v. Astrue*, No. 08-956, 2009 WL 1763295, at *9 (W.D. Wash. June 18, 2009) ("The ALJ concluded that [the claimant's] poor work history, with reported earnings of less than $19,000 during her entire lifetime, was evidence of lack of motivation to work. . . . The ALJ has offered nothing to support his conclusion that her poor work history is attributable to lack of motivation as opposed to her underlying mental impairments."); *cf.* *Weetman v. Sullivan*, 877 F.2d 20, 22-23 (9th Cir. 1989) (affirming the rejection of a treating physician's opinion that the claimant was disabled as of 1979, and noting that the opinion was "clearly inconsistent [with the fact that the claimant] engaged in substantial gainful activity" post-onset date).

The Commissioner next argues that the ALJ appropriately discounted Eriksson's opinion because Eriksson noted that she had not seen Thom in "quite some time." (Tr. 26; Def.'s Br. at 14.) The Commissioner compares this case to *Crane v. Shalala*, 76 F.3d 251 (9th Cir. 1996), where the Ninth Circuit affirmed the ALJ's decision to discount a therapist/social worker's opinion based, in part, on the fact that the she did not have "sufficient contact with [the claimant] during the relevant time." *Id.* at 254. The Commissioner asserts that Eriksson likewise did not have sufficient contact with Thom because she "only [treated] Thom for two months." (Def.'s Br. at 15.)

The Court is not persuaded by the Commissioner's reliance on *Crane*. As an initial matter, the Court notes that the ALJ never stated that he was discounting Eriksson's opinion based on the length of the treating relationship; rather, the ALJ discounted Eriksson's opinion

because Eriksson stated that she had not seen Thom in "quite some time," which is why Eriksson was "unsure which medications [Thom was] currently taking" when she issued her opinion. (Tr. 26, 512.) The Court "review[s] only the reasons provided by the ALJ in the disability determination and may not affirm the ALJ on a ground upon which he did not rely." *Orn v. Astrue*, 495 F.3d 625, 630 (9th Cir. 2007) (citing *Connett v. Barnhart*, 340 F.3d 871, 874 (9th Cir. 2003)). Accordingly, the Court cannot affirm the ALJ's decision based on the length of Eriksson's treating relationship because that was not a ground upon which the ALJ based his decision. Furthermore, *Crane* is distinguishable because in that case the therapist/social worker saw the claimant "for only two weeks before the date" her eligibility for benefits ceased, and her initial therapy involved her husband and "did not address [the claimant's] problems specifically." *Id.* at 254. By contrast, in this case, Eriksson treated Thom from May 7, 2013, to July 31, 2013, Eriksson's treatment focused exclusively on Thom's mental impairments, and Eriksson had the benefit of being able to review "all of [Thom's prior treatment] records" because Thom had participated in treatment at Eriksson's clinic since September 2012. (*See* Tr. 285, 433, 511.)

Finally, the Commissioner notes that, "even if the ALJ's analysis is inartful, it is evident that the ALJ assigned greater weight to the opinions" of the state agency psychiatrists. (Def.'s Br. at 16.) The Commissioner argues that these "conflicting opinions alone constitute a valid basis" for discounting Eriksson's opinion. (Def.'s Br. at 16, citing, *inter alia*, *Molina v. Astrue*, 674 F.3d 1104 (9th Cir. 2012)). In *Molina*, the Ninth Circuit held that the ALJ provided germane reasons for discounting a physician's assistant's opinion "where it conflicted with" an examining psychiatrist's evaluation. *Id.* at 1108-12. The ALJ, however, also provided other germane reasons for discounting the physician's assistant's opinion, and in doing so, the ALJ explicitly held that the physician's assistant's opinion was inconsistent with the psychiatrist's opinion. *See*

*id*. at 1112 ("Finally, as the ALJ held, Wheelwright's opinion was inconsistent with that of Dr. Yost, who specialized in the relevant field of psychiatry, and whose opinion was therefore entitled to greater weight.").[5]

In this case, by contrast, the ALJ failed to provide other germane reasons for discounting Eriksson's opinion, and the ALJ never explicitly held that he was discounting Eriksson's opinion because it conflicted with the opinions of the state agency psychiatrists. (*See* Tr. 26, assigning "great weight" to the opinions of the state agency psychiatrists because the opinions "are consistent" with the RFC and "the available medical evidence," which presumably included Eriksson's opinion and records, and because the psychiatrists "are experts who are familiar with the disability program and its requirements," and then proceeding to assign "little weight" to Eriksson's opinion, but noting that the limitations Eriksson identified "are mostly consistent" with the RFC). Although ALJs are not required to "clearly link" their "arguably germane reasons" to the portion of the decision discounting an "other source" or lay witness's opinion, the ALJ's germane reasons still need to be set forth "at other points in his decision." *See Lewis v. Apfel*, 236 F.3d 503, 512 (9th Cir. 2001) ("While the ALJ, in [the portion of the decision] dismissing the [lay witnesses'] testimony, did not specify any inconsistent 'prior recorded statements,' he did note some arguably contradictory testimony at other points in his decision. . . . In all, the ALJ at least noted arguably germane reasons for dismissing the [lay witnesses'] testimony, even if [the ALJ] did not clearly link his determination to those reasons.").

---

[5] The ALJ made a similarly explicit holding in discounting the testimony provided by lay witnesses. *See Molina*, 674 F.3d at 1122 ("Specifically, the ALJ determined that Molina's claim that her anxiety disorder made her unable to work was contradicted by [among other things] Dr. Yost's evaluation[.]").

For these reasons, substantial evidence does not support the ALJ's decision to discount Eriksson's opinion.

## II.     THOM'S SYMPTOM TESTIMONY

### A.     Applicable Law

Absent an express finding of malingering, an ALJ must provide clear and convincing reasons for rejecting a claimant's testimony:

> Without affirmative evidence showing that the claimant is malingering, the [ALJ]'s reasons for rejecting the claimant's testimony must be clear and convincing. If an ALJ finds that a claimant's testimony relating to the intensity of his pain and other limitations is unreliable, the ALJ must make a credibility determination citing the reasons why the testimony is unpersuasive. The ALJ must specifically identify what testimony is credible and what testimony undermines the claimant's [subjective] complaints.

*Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d 595, 597 (9th Cir. 1999) (citations omitted). Clear and convincing reasons for rejecting a claimant's testimony "include conflicting medical evidence, effective medical treatment, medical noncompliance, inconsistencies in the claimant's testimony or between her testimony and her conduct, daily activities inconsistent with the alleged symptoms, and testimony from physicians and third parties about the nature, severity and effect of the symptoms complained of." *Bowers v. Astrue*, No. 6:11-cv-583-SI, 2012 WL 2401642, at *9 (D. Or. June 25, 2012); *see also Molina*, 674 F.3d at 1112 ("[T]he ALJ is not 'required to believe every allegation of disabling pain, or else disability benefits would be available for the asking, a result plainly contrary to 42 U.S.C. § 423(d)(5)(A).'" (quoting *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989))).

### B.     Application of Law to Fact

There is no affirmative evidence that Thom is malingering and, therefore, the ALJ was required to provide clear and convincing reasons for discrediting Thom's symptom testimony.

Upon review, the Court finds that the ALJ failed to satisfy the clear and convincing reasons standard.

### 1. The *Chenery* Rule

In the event an ALJ elects to discount a claimant's testimony, the ALJ is required to "specifically identify the testimony from a claimant she or he finds not to be credible and explain what evidence undermines the testimony." *Treichler v. Comm'r Soc. Sec. Admin.*, 775 F.3d 1090, 1102 (9th Cir. 2014) (citation, quotation marks, and brackets omitted). General findings will not suffice "because the 'grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based.'" *Id.* (quoting *SEC v. Chenery Corp.*, 318 U.S. 80, 87 (1943)). Consistent with these principles of administrative law, a reviewing federal court "cannot substitute [its] conclusions for the ALJ's, or speculate as to the grounds for the ALJ's conclusions." *Id.* (citation omitted); *see also Novosteel SA v. U.S. Bethlehem Steel Corp.*, 284 F.3d 1261, 1276 (Fed. Cir. 2002) (Dyk, J., dissenting) (explaining that "the *Chenery* rule" bars "affirmance of agency decisions based on new arguments by counsel").

Here, the ALJ's analysis falls short of specifically identifying what testimony he found not to be credible and explaining what evidence undermines Thom's testimony. In his decision, the ALJ recounted Thom's hearing testimony before stating that Thom's "statements concerning the intensity, persistence, and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision." (*See* Tr. 23-24.) The ALJ then described the medical records regarding Thom's headaches, ear problems, carpal tunnel syndrome, and mental impairments, but the ALJ did not specifically identify testimony from Thom and explain how the medical record undermined her testimony. (*See* Tr. 24-25.) For this reason and those that follow, the ALJ failed to satisfy the clear and convincing reasons standard. *See generally Trevizo*, 871 F.3d at

682 n.10 ("The government cites two additional credibility findings the ALJ purportedly made[.] . . . Because the discussion of those issues is not in the section of the ALJ's decision addressing Trevizo's symptom testimony, they are not properly considered credibility findings."); *Roddy v. Astrue*, 705 F.3d 631, 638 (7th Cir. 2013) (noting that the Commissioner "r[an] up against the *Chenery* rule" when the ALJ made a "passing" reference to evidence but "did not connect" it "to any conclusion" in the ALJ's credibility determination).

## 2. Headaches and Ear Problems

The Commissioner argues that the ALJ's findings regarding Thom's "subjective complaints concerning her ear problems and headaches" is "unchallenged," that Thom has therefore waived any challenge to that portion of the ALJ's decision, and that the ALJ "could reasonably consider" Thom's lack of "candor" or "credibility" in these areas "when assessing Thom's other allegations concerning carpal tunnel syndrome and mental impairments." (Def.'s Br. at 5-6.) The Commissioner's argument is flawed. Thom challenged the ALJ's credibility determination in its entirety by arguing that the ALJ merely provided "a review of the medical records" and failed "to identify reasons contained therein showing Thom is not fully credible." (Pl.'s Br. at 13.) Thus, Thom did not waive a challenge to any portion of the ALJ's treatment of her testimony.

Further, the ALJ's discussion of Thom's headaches and ear problems fails to support his decision to discount Thom's symptom testimony. With respect to headaches, the ALJ noted that Thom testified that she experiences migraines, which "have been worsened by the chronic mastoiditis behind her right ear," and observed on the next page of his decision that a neurologist opined that Thom's chronic mastoiditis (i.e., an impairment the ALJ determined was severe) was "'by far' the mostly likely cause of her headaches." (Tr. 23-24.) These findings are not adequate

grounds to discount Thom's symptom testimony where the record suggests Thom's headaches stem from a severe impairment that has been confirmed by objective testing.

With respect to ear problems, the ALJ noted that Thom testified at the hearing that she "lost all hearing on the right side," and observed on the next page of his decision that "[t]here is nothing in the record to suggest that [Thom] has complete hearing loss on the right side." (Tr. 23-24.) The ALJ added that a "mental health note" stated that Thom's "hearing was normal without correction," but an otolaryngologist also indicated that Thom "continued to have right conductive hearing loss" and the "severity was not mentioned" in those medical records. (Tr. 24.) Once again, the Court is not persuaded that these findings are sufficient grounds for discounting Thom's testimony because an otolaryngologist diagnosed Thom with "continued conductive hearing loss," chronic infection in the mastoid bone behind her right ear, and a "recurrent cholesteatoma" (i.e., a skin growth that develops behind Thom's right eardrum). (Tr. 556.) These diagnoses appear to be largely consistent with Thom's reports of right side hearing deficits.

### 3.  Carpal Tunnel Syndrome

The ALJ discounted Thom's carpal tunnel syndrome-related testimony on the ground that it is inconsistent with Thom's activities: "Despite claims of hand and wrist pain, the claimant's mother advised that the claimant enjoys crocheting. In addition, a mental health [treatment] note . . . indicated that the claimant was texting her son's father with some apparent regularity." (Tr. 24.) "Engaging in daily activities that are incompatible with the severity of symptoms alleged can support an adverse credibility determination." *Ghanim v. Colvin*, 763 F.3d 1154, 1165 (9th Cir. 2014). Here, the mere fact that Thom "enjoys" crocheting does not constitute an adequately specific conflict with Thom's reported limitations. Indeed, although Thom's mother listed crocheting as one of Thom's hobbies, Thom reported that crocheting negatively impacted

her carpal tunnel syndrome. (*See* Tr. 208, listing crocheting as one of Thom's hobbies in a third-party function report dated December 24, 2012, Tr. 414, noting on November 5, 2012, that Thom reported that her "carpal tunnel syndrome [is] worse on nights she crotchets during the day prior"). In addition, there is no information in the record about the amount of time Thom spends text messaging her son's father. *Cf. Trevizo*, 871 F.3d at 682 (rejecting the ALJ's reliance on a claimant's reported activities where there was "almost no information in the record about" those activities). Thom testified that her "fingers go numb" and her "hand cramps up" after using the phone for "[j]ust a couple of minutes." (Tr. 52.) The fact that Thom exchanges text messages with her son's father "with some apparent regularity" is not necessarily inconsistent with Thom's testimony.

The Commissioner argues that Thom's testimony is "inconsistent with other evidence in record." (Def.'s Br. at 7.) In support of her assertion, the Commissioner notes that (1) despite alleging that "she cannot hold objects for a [sic] longer than a few minutes," Thom's mother did not testify that Thom had any hand limitations; (2) despite reporting that "she can only hold her phone for a few minutes," Thom was "advised to text her boyfriend less frequently to manage her mental health symptoms," and (3) Thom "told her counselor that she "sometimes stays up" late reading, watching television, "or on her phone." (Def.'s Br. at 7.) The Commissioner also argues that Thom's testimony is inconsistent with objective medical findings. (Def.'s Br. at 8.) These are not properly considered credibility findings because the ALJ did not explicitly hold that Thom's testimony concerning her carpal tunnel syndrome was undermined by objective medical findings or the record evidence cited by the Commissioner. *See Trevizo*, 871 F.3d at 682 n.10 ("Because the discussion of those issues is not in the section of the ALJ's decision addressing Trevizo's symptom testimony, they are not properly considered credibility

findings."); *Roddy*, 705 F.3d at 638 (holding that an ALJ must do more than make a passing reference to evidence; rather, he must "connect" it to a conclusion reached in assessing the testimony).

### 4.        Mental Impairments

The ALJ addressed Thom's mental impairment-related complaints on page twenty-five of his decision and the first paragraph of page twenty-six. (*See* Tr. 25-26.) The Commissioner argues that Thom's work history undermines her testimony regarding her mental limitations. (Def.'s Br. at 9, 11-12.) The ALJ, however, never held that Thom's work history undermined her testimony. In fact, as the Commissioner acknowledges, the ALJ did not mention Thom's work history in the section of his decision addressing Thom's testimony; rather, he mentioned it in the portion of his decision addressing Lefore's testimony. (*See* Tr. 27; Def.'s Br. at 11, citing Tr. 27.) Accordingly, Thom's work history did not bear on the ALJ's credibility finding. Furthermore, as discussed above, Thom's work history seems to be consistent with the fact that her mental health symptoms interfered with her ability to sustain substantial gainful employment.

The Commissioner also notes that "there are inconsistencies in Thom's response to treatment," that "there are inconsistencies regarding Thom's alleged sleep disturbance," and that Thom's "mental status examinations have been consistently normal." (Def.'s Br. at 9-10.) The ALJ did making passing reference to some normal or unremarkable findings in discussing Thom's mental health records, but the ALJ never tied that evidence to an adverse credibility finding. The ALJ also never explicitly held that Thom's testimony was undermined by inconsistencies in Thom's "response to treatment" or "alleged sleep disturbance." (*See* Tr. 25-26.) Additionally, the Court fails to see how Thom's testimony is undermined by inconsistent symptoms or treatment response. *See Garrison*, 759 F.3d at 1017 ("As we have emphasized while discussing mental health issues, it is error to reject a claimant's testimony merely because

symptoms wax and wane in the course of treatment. Cycles of improvement and debilitating symptoms are a common occurrence[.]"); *cf.* Tr. 512, stating that the symptoms associated with Thom's mental health diagnoses "often come and go and get better and worse," and Thom "may be able to function well for a couple days followed by several days of inability to even get out of bed," Tr. 514, stating that Thom's symptoms "wax [and] wane creating significant disruption in her life").

In sum, the ALJ did not offer specific, clear, and convincing reasons for rejecting Thom's testimony.

## III.    REMAINING ARGUMENTS

Thom also argues that the ALJ erred by failing to provide germane reasons for discounting Lefore's lay witness testimony, and by failing to resolve a conflict between the VE's testimony and the DOT. In light of the errors described above, the Court need not address these remaining arguments. *See McBride v. Colvin*, No. 13-cv-01311-PHX-SPL, 2014 WL 4053442, at *5 (D. Ariz. Aug. 14, 2014) ("The ALJ did not offer reasons that are specific, legitimate, and supported by the record, and therefore erred in rejecting Dr. Agarwal's opinion. Having reached this conclusion, the Court need not address Plaintiff's arguments concerning the ALJ's evaluation of Dr. Reynold's opinion or lay witness testimony."); *Reynolds v. Astrue*, No. 09-0302, 2010 WL 3981434, at *5 n.4 (S.D. Ind. Oct. 7, 2010) (declining to address the argument that VE's testimony was inconsistent with the DOT where the ALJ committed errors that undermined the RFC).

## IV.    REMEDY

"Generally when a court of appeals reverses an administrative determination, 'the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation.'" *Benecke v. Barnhart*, 379 F.3d 587, 595 (9th Cir. 2004) (citation omitted).

However, in a number of Social Security cases, the Ninth Circuit has "stated or implied that it would be an abuse of discretion for a district court not to remand for an award of benefits" when three conditions are met. *Garrison*, 759 F.3d at 1020 (citations omitted). Specifically, the following "credit-as-true" criteria must be met before a court can remand for an award of benefits: (1) "the ALJ has failed to provide legally sufficient reasons for rejecting evidence, whether claimant testimony or medical opinion," (2) "if the improperly discredited evidence were credited as true, the ALJ would be required to find the claimant disabled on remand," and (3) "the record has been fully developed and further administrative proceedings would serve no useful purpose." *Id.* Even when these "credit-as-true" criteria are satisfied, courts in this circuit retain the "flexibility to remand for further proceedings when the record as a whole creates serious doubt as to whether the claimant is, in fact, disabled within the meaning of the Social Security Act." *Id.*; *see also Leon v. Berryhill*, ---- F.3d ---- , 2017 WL 5150294, at *3 (9th Cir. Nov. 7, 2017) (explaining that the credit-as-true rule "does not require the [district] court to remand for an immediate award of benefits when the three [credit-as-true] rule conditions have been satisfied").

Thom argues that the Court should remand for an award of benefits because the ALJ improperly discredited Eriksson's opinions and Thom's testimony, and because Eriksson's opinion alone "establishes" that Thom is disabled. (Pl.'s Br. at 15-16.) The Commissioner argues that further proceedings are warranted because, even "assuming *arguendo* that the Commissioner raised an impermissible *post hac* rationalization as to the merits, such an argument must be considered as a basis for remand." (Def.'s Br. at 20, citing *Burrell v. Colvin*, 775 F.3d 1133, 1141 (9th Cir. 2014)).

In *Burrell*, the Ninth Circuit held that it was unnecessary to determine whether the three credit-as-true criteria were met "because, even assuming that they [we]re, . . . the record as a whole create[d] serious doubt as to whether [the] [c]laimant [wa]s, in fact, disabled." 775 F.3d at 1141. In declining to credit testimony provided by the claimant and her treating physician, the Ninth Circuit cited evidence that suggested that the claimant "may not be credible" (e.g., testimony concerning the claimant's "ability to knit" that appeared "to contradict the medical record," and evidence suggesting that the claimant's "headaches were secondary to her neck problems, but her neck problems *improved*, both objectively and subjectively, after surgery"). *Id.* at 1141.

Here, as in *Burrell*, the record as a whole suggests that Thom "may be disabled," but it also "contains cause for serious doubt." *Id.* at 1142. For example, although Thom claims that her mental health impairments often times prevent her from getting out of bed, the record also suggests that Thom exercises daily and joined a public gym. (*Compare* Tr. 196, testifying on November 9, 2012, that "a lot of days [Thom is] not even . . . able to get out of bed," *with* Tr. 336, 343, 377, 386, 392, 398, noting in 2012 and 2013 that Thom "[e]xercises daily," *and* Tr. 606, noting on March 18, 2014, that Thom "jointed [P]lanet [F]itness" and was engaged in "exercises like bik[ing and] walking"). The record also indicates that Thom's providers at times made conservative treatment recommendations, that Thom was not always compliant with providers' treatment recommendations, and that Thom was "looking for work" post-onset date. (*See* Tr. 287, stating Thom was "currently unemployed but looking for work," Tr. 303, discussing the "value of exercise" during therapy and advising Thom to "track daily use of meds as she currently takes them sporadically," Tr. 422, recommending "regular exercise" and discussing "the importance of [a] good healthy low fat diet," Tr. 528, noting that Thom "did not

follow-up for [an] allergy consultation as previously recommended" by her otolaryngologist, Tr. 544, noting that Thom had "not been using eardrops as previously recommended," Tr. 645, noting that Thom admitted to lying in response to a question on her provider's "initial [mental health] screening," Tr. 707, noting that Thom was "not taking medications as prescribed" by her treating nurse practitioner, and that Thom "made no effort" to follow-up on his recommendation "to change [her] sleep pattern," Tr. 760, noting that Thom stopped using marijuana in October 2014 and used it "up to daily"). In light of the foregoing, the Court concludes that Thom "may be disabled," but a remand for an award of benefits is inappropriate because the record as a whole "contains cause for serious doubt."

## CONCLUSION

For the foregoing reasons, the Court recommends that the district judge REVERSE the Commissioner's decision and REMAND for further administrative proceedings.

## SCHEDULING ORDER

The Findings and Recommendation will be referred to a district judge. Objections, if any, are due fourteen (14) days from service of the Findings and Recommendation. If no objections are filed, the Findings and Recommendation will go under advisement on that date. If objections are filed, a response is due fourteen (14) days after being served with a copy of the objections. When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.

DATED this 9th day of November, 2017.

_Stacie F. Beckerman_

_____
STACIE F. BECKERMAN
United States Magistrate Judge